FILED
2026 Aug-18 PM 04:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VITAL CARE INFUSION SERVICES, LLC;**<br><br>***Plaintiff,***<br><br>**v.**<br><br>**MEDLIFE INFUSION NURSING, LLC, WESLEY DUCKWORTH, AND CHRISTOPHER PALMEDO;**<br><br>***Defendants.*** | ) | **Case No. ____________________**<br><br>**JURY TRIAL DEMANDED** |

**<u>COMPLAINT AND REQUEST FOR INJUNCTION</u>**

**INTRODUCTION**

1. Plaintiff VitalCare Infusion Services, LLC ("VitalCare") seeks preliminary and permanent injunctive relief to stop the theft of trade secrets and confidential business information by Defendant MedLife Infusion Nursing, LLC ("MedLife") and its officers Wesley Charles Duckworth ("Duckworth") and Christopher Palmedo ("Palmedo") in violation of federal and state law and in breach of MedLife's contractual confidentiality obligations to VitalCare and VitalCare's network of pharmacies (collectively with VitalCare, "VC Businesses"). MedLife is using the confidential information to steal patients of VC Businesses ("VC Patients"), thereby causing VC Businesses ongoing irreparable harm.

2. VC Businesses use MedLife's nurse staffing services to administer infusion therapy to VC Patients. To facilitate care, VC Businesses provide MedLife with access to identifying information about VC Patients, along with sensitive and confidential health information, such as diagnoses and treatment needs, of those same patients (the "Proprietary Patient Information"). In

breach of its contractual confidentiality obligations, MedLife is actively misappropriating Proprietary Patient Information in an effort to exploit patient trust in MedLife-affiliated nurses and redirect those patients to competitor pharmacies, for MedLife's own benefit. VitalCare seeks an immediate injunction to stop MedLife's continued misappropriation efforts and avoid an unknown degree of competitive harm through the loss of patient relationships. VitalCare additionally seeks damages for the same losses.

**PARTIES**

3. Plaintiff VitalCare Infusion Services, LLC is a Delaware limited liability company based in Brentwood, Tennessee. VitalCare, as manager of its VitalCare Franchisor, LLC ("Franchisor"), provides high-quality infusion therapy to patients with acute and chronic conditions through its network of pharmacies, VC Businesses.[1] Pursuant to franchise agreements with VC Businesses, VitalCare, through Franchisor, is entitled to royalty fees as a percentage of the franchisees' gross revenue.

4. Defendant MedLife Infusion Nursing, LLC, an Alabama limited liability company, is a nurse staffing agency based in Pell City, Alabama. MedLife provides nursing staff to infusion providers such as VC Businesses.

5. Defendant Wesley Charles Duckworth is the Chief Nursing Officer of MedLife, a citizen of Alabama, and a resident of this District.

6. Defendant Christopher Palmedo is the Chief Executive Officer of MedLife, a citizen of Alabama, and a resident of this District.

[1] VC Businesses are franchisees of Franchisor LLC, VitalCare's wholly-owned subsidiary. In addition to owning 100% of outstanding units in the Franchisor, Plaintiff VitalCare is the manager of the Franchisor and is obligated to manage the intellectual property that is the subject of this Complaint.

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. § 1331. VitalCare brings claims under 18 U.S.C. § 1836, *et seq.,* among other claims.

8. Venue is proper in this forum under 28 U.S.C. §1391 because Defendant MedLife is incorporated in and is a citizen of this judicial district.

## FACTS

9. To administer their infusion services, VC Businesses contract with nurse staffing agencies such as MedLife. VitalCare has designated MedLife as Preferred Provider to VC Businesses.

10. VC Businesses who use MedLife staffing services include Show Me State Infusion Pharmacy, LLC of Kansas City ("KC VC") and Dang Home Infusion Pharmacy, LLC d/b/a Vital Care of Peoria, Illinois. ("Peoria VC").

### MedLife's Confidentiality Obligations

11. Like all VC Businesses who use MedLife, KC VC and Peoria VC each entered Staffing Agreements with MedLife ("Staffing Agreements"). The Staffing Agreement between KC VC and MedLife is attached hereto as Exhibit 1 ("KC Staffing Agreement"). The Staffing Agreement between Dang and MedLife is attached hereto as Exhibit 2 ("Peoria Staffing Agreement").

12. The Staffing Agreements each provide as follows:

> **4.2 Confidentiality**. Parties may be allowed access to confidential records, information, materials and data ("Confidential Information") which are the property of each Party, and which are used in the course of its business. During the Term of this Agreement and at all times thereafter, Parties shall not, except with the prior written consent of the affected party, directly or indirectly copy, disclose, or use any of such records, information, materials or data for its own benefit, or the benefit of

> any person or entity not a party to this Agreement. The Confidential Information is and shall remain the sole and exclusive property of the applicable or affected party during the period of this Agreement and thereafter. Agency shall advise placed Placement of its obligations hereunder. This section shall survive the natural expiration or any termination of this Agreement.

*See* Exhibit 1 Sec 4.2; Exhibit 2 Sec. 4.2.

13. Pursuant to the Staffing Agreements, MedLife has access to Confidential Information (as the term is defined therein) belonging to VC Businesses.

14. Pursuant to the Staffing Agreements, MedLife is prohibited from using Confidential Information for its own benefit or for the benefit of a third party.

15. The Confidential Information includes Proprietary Patient Information. Further, the Proprietary Patient Information includes Protected Health Information (PHI) under HIPAA regulations (45 CFR Part 164). Consequently, as required under HIPAA, each VC Business also entered a Business Associate Agreement (BAA) with MedLife. MedLife's BAA with Peoria VC is attached hereto as Exhibit 3.

16. Pursuant to each of the BAAs, MedLife is prohibited from using or disclosing PHI for marketing purposes, and prohibited from using or disclosing PHI other than as permitted by the Staffing Agreements or as required by law. Exhibit 3, Sec. III(A), (C).

**MedLife's Misappropriation of the Confidential Information**

17. MedLife's nursing staff are independent contractors.

18. A large segment of VC Patients receive Immune Globulin (IG) therapy. Some of the IG patients receive Intravenous Immunoglobulin (IVIG). IG and IVIG therapies are expensive and the patients receiving them are particularly profitable for VC Businesses.

19. No later than early August 2026, MedLife began soliciting MedLife nurses to help MedLife siphon patients away from VC Businesses, in breach of the Staffing Agreements and the BAAs. These solicitations specifically concerned patients receiving IVIG.

20. On August 5, 2026, a nurse contractor of MedLife serving VC Peoria ("Nurse 1"), received a text message from someone identifying themselves as "Wes, CNO of MedLife." The message asked Nurse 1 if their "IG patient(s) would want to follow you to another pharmacy?"



21. On August 6, 2026, Nurse 1 received another text message, this time from a phone number with which Nurse 1 routinely corresponded concerning MedLife-related scheduling. This message referred to a specific IVIG patient, asking if "patient G.G. [would] want to follow you?"




22. On the morning of August 6, 2026, Nurse 1 called Wes Duckworth, Chief Nursing Officer of MedLife, and spoke for approximately five minutes. Duckworth told Nurse 1 that pharmacies are "pulling back" patients to in-house nursing staff, and that nurses like Nurse 1 might lose hours or no longer be able to service certain IVIG patients. Duckworth asked Nurse 1 again if they would want to switch to a different pharmacy to keep serving their current patients.

23. The same morning, Nurse 1 received a call from the phone number she used for MedLife scheduling. The caller was Christopher Palmedo ("Palmedo"). Palmedo began asking Nurse 1 the same questions Duckworth had asked.

24. On August 5, 2026, Duckworth texted another MedLife nurse serving KC VC's patients ("Nurse 2"). The message stated that pharmacies would be reducing MedLife nurse hours, asked if Nurse 2's patients would follow them to another pharmacy, and offered to assist in having such conversations with patients.



25. Duckworth's messages to Nurse 1 and Nurse 2 and Palmedo's statements to Nurse 1 each constitute a breach of MedLife's obligations under the Staffing Agreements to not use Confidential Information for its own benefit, or the benefit of third parties.

26. Through Duckworth and Palmedo, MedLife used Confidential Information to target the nurses of IVIG patients in an effort to redirect such patients to a competitor of VitalCare.

27. This improper use stands to benefit MedLife because it would allow MedLife to preserve business MedLife anticipates it may lose, by moving VC Patients to alternative pharmacies in the event VC Businesses have a reduced need for MedLife's staffing services.

28. These actions also breach MedLife's obligations under the BAAs to not use or disclose PHI for marketing purposes.

29. Pursuant to CFR §164.502(a)(3), MedLife, as a Business Associate, was permitted to use PHI only as permitted or required by the BAAs or other contracts with the VC Businesses, each of which is a Covered Entity. Because MedLife's misappropriation was a breach of the BAAs and the Staffing Agreement, it also constitutes a HIPAA violation.

30. The Confidential Information that MedLife used in breach of the Staffing Agreements and BAAs included Proprietary Patient Information. This is clear because one message from referred to a specific patient known to be very profitable. Other messages referred to specific treatments.

31. The Proprietary Patient Information constitutes a trade secret.

32. The Proprietary Patient Information has independent economic value by virtue of its secrecy. A competitor in possession of the information can use it to poach VC Patients, targeting VC Businesses' most profitable patients (i.e. IVIG patients), exactly as MedLife is doing now.

33. A competitor could not replicate this information on its own accord, as it is the product of goodwill VC Businesses incurred through years of outstanding care and the development of relationships with referring physicians.

34. MedLife misappropriated the Proprietary Patient Information by using or disclosing it in breach of MedLife's obligations under the Staffing Agreements and the BAAs, and MedLife knew this use was improper.

35. The Proprietary Patient Information relates to a product or service used in interstate commerce. The Proprietary Patient Information enables the provision of care in multiple states and concerns VC Patients in multiple states, and VC Businesses located in multiple states. MedLife's misappropriation is known to have targeted VC Businesses in Illinois and Missouri. VitalCare is informed and believes that MedLife has targeted VC Businesses in many other states as well.

36. MedLife's misappropriation is causing VC Businesses ongoing, irreparable harm due to loss of competitive advantage, and the actual and potential loss of VC Patients, causing unascertainable future damages.

37. MedLife has also created a liability for VitalCare to its franchisees. VitalCare has designated MedLife as "Preferred Provider." As such, franchisees may seek relief from VitalCare where MedLife has misappropriated trade secrets to steal patients, resulting in loss of revenue for the VC Business. This will impact VitalCare's ability to retain franchisees and to maintain the network of trusted vendor relationships it has so carefully crafted to support its franchise system.

## COUNTS

### COUNT I:
### REQUEST FOR PRELIMINARY INJUNCTION
(Against MedLife, Duckworth and Palmedo)

38. VitalCare incorporates paragraphs 1 through 37 of this Complaint as if fully set forth herein.

39. VitalCare is likely to succeed on the merits of its DTSA claim because it can demonstrate the elements of misappropriation. The Proprietary Patient Information constitutes a protectable trade secret, deriving independent economic value from its secrecy, and VC Businesses took reasonable steps to ensure its secrecy by including confidentiality provisions in the Staffing Agreement and BAAs. MedLife misappropriated the Proprietary Patient Information by attempting to exploit its nurses' relationships with VC Patients to redirect the patients to alternative pharmacies that may offer more business to MedLife. The Proprietary Patient Information touches interstate commerce because it concerns patients from multiple states, care provided in multiple states, and VC Businesses located in at least Missouri and Illinois and likely other states as well.

40. If preliminary injunctive relief is not granted, VitalCare will suffer ongoing, irreparable harm because MedLife will be allowed to continue its misappropriation and efforts to poach VC Patients, causing unascertainable future damages.

41. The balance of equities favors granting VitalCare immediate injunctive relief, because VitalCare will continue to suffer the hardship of irreparable injury and loss of patients, whereas MedLife will suffer no harm through the injunction: it will merely be forced to comply with contractual confidentiality terms to which it is already bound. The preliminary injunction will return the parties to the status quo.

42. Granting a preliminary injunction will serve the public interest because the protection of trade secrets promotes innovation and investment and preserves fair competition rather than the use of improper means to gain competitive advantage. These policy objectives were embedded by Congress in the DTSA framework, and the same considerations underpin state trade secret statutes.

**COUNT II:**
**FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATION OF DEFEND TRADE SECRETS ACT ("DTSA") (18 U.S.C. § 1836, et seq.)**
(Against MedLife)

43. VitalCare incorporates paragraphs 1 through 37 of this Complaint as if fully set forth herein.

44. The Proprietary Patient Information constitutes a trade secret as defined by the DTSA.

45. The Proprietary Patient Information has independent economic value by virtue of its secrecy because a competitor in possession of the information can use it to attempt to poach VC Patients, targeting VC Businesses' most profitable patients (i.e. IVIG patients), just as MedLife has done.

46. VitalCare took reasonable steps to keep the Proprietary Patient Information secret, including the use of a confidentiality clause in the Staffing Agreement and requiring MedLife to enter a BAA.

47. MedLife misappropriated the Proprietary Patient Information breach of the Staffing Agreements and BAAs, by seeking to exploit patient trust in nurses to redirect VC Patients to competitor pharmacies that may have a greater need for MedLife's services and/or provide more business to MedLife. MedLife knew this use was improper, because it was prohibited under the Staffing Agreements and BAAs to which MedLife agreed.

48. MedLife's ongoing misappropriation is causing VitalCare actual damages and unascertainable future damages, constituting irreparable harm due to loss of competitive advantage and through the actual and potential loss of VC Patients.

**COUNT III:**
**FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATION OF THE ILLINOIS TRADE SECRETS ACT (765 Ill. Comp. Stat. Ann. 1065/1 et seq.)**
(Against MedLife)

49. VitalCare incorporates paragraphs 1 through 3 of this Complaint as if fully set forth herein.

50. The Proprietary Patient Information constituted a trade secret, deriving economic value from its secrecy. Competitors in possession of the Proprietary Patient Information can use it to poach VC Patients and target the highly profitable IVIG patients, just as MedLife is doing.

51. VitalCare took reasonable steps to maintain the secrecy of the Proprietary Patient Information, requiring MedLife to agree to the confidentiality provisions of the Staffing Agreements and the BAAs.

52. MedLife misappropriated the Proprietary Patient Information, improperly using it in breach of its obligations under the Staffing Agreements and BAAs. MedLife knew this use was improper because it agreed to the terms of the Staffing Agreements and BAAs.

53. MedLife is using the Proprietary Patient Information to attempt to its own benefit, attempting to lure patients away from VC Businesses and redirect them to pharmacies who may offer more business to MedLife.

54. MedLife's ongoing misappropriation is causing VitalCare actual damages and unascertainable future damages, constituting irreparable harm due to the loss of competitive advantage and through the actual and potential loss of patients.

**COUNT IV:**
**FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATION OF THE MISSOURI UNIFORM TRADE SECRETS ACT (Mo. Ann. Stat. §417.450)**

55. VitalCare incorporates paragraphs 1 through 37 of this Complaint as if fully set forth herein.

56. The Proprietary Patient Information constituted a trade secret, deriving economic value from its secrecy. Competitors in possession of the Proprietary Patient Information can use it to poach VC Patients and target the highly profitable IVIG patients, just as MedLife is doing.

57. VitalCare took reasonable steps to maintain the secrecy of the Proprietary Patient Information, requiring MedLife to agree to the confidentiality provisions of the Staffing Agreements and the BAAs.

58. MedLife misappropriated the Proprietary Patient Information, improperly using it in breach of its obligations under the Staffing Agreements and BAAs. MedLife knew this use was improper because it agreed to the terms of the Staffing Agreements and BAAs.

59. MedLife used the Proprietary Patient Information to attempt to its own benefit, attempting to lure patients away from VC Businesses and redirect them to pharmacies who may offer more business to MedLife.

60. MedLife's ongoing misappropriation is causing VitalCare actual damages and unascertainable future damages, constituting irreparable harm due to the loss of competitive advantage and through the actual and potential loss of patients.

**COUNT V:**
**BREACH OF CONTRACT**
**(Staffing Agreements)**
(Against MedLife)

61. VitalCare incorporates paragraphs 1 through 37 of this Complaint as if fully set forth herein.

62. MedLife breached the Staffing Agreements by using or disclosing the information for its own benefit.

63. VitalCare has been damaged by MedLife's breach through the actual and potential loss of patients.

**COUNT VI:**
**BREACH OF CONTRACT**
**(BAA)**
(Against MedLife)

64. VitalCare incorporates paragraphs 1 through 37 of this Complaint as if fully set forth herein.

65. Pursuant to Section III of the BAAs, MedLife was prohibited from using PHI for marketing purposes.

66. MedLife breached the BAAs by using PHI to solicit nurses to influence their patients to move pharmacies, which is a marketing purpose.

67. VitalCare has been damaged by MedLife's breach through the actual and potential loss of patients.

**PRAYER FOR RELIEF**

WHEREFORE, VitalCare requests this Court:

A. Entering an order:

1. Enjoining MedLife, its affiliates, officers, agents, employees and representatives, including Duckworth and Palmedo, from using, disclosing, or otherwise exploiting any Proprietary Patient Information or Confidential Information of VitalCare or any VC Business;

2. Enjoining MedLife, its affiliates, officers, agents, employees and representatives, including Duckworth and Palmedo, from soliciting, contacting, or communicating with any VC Patient, or soliciting or encouraging any MedLife nurse or contractor to contact any VC Patient, for the purpose of redirecting, diverting, or influencing any VC Patient to transfer to a pharmacy or infusion provider other than the VC Business currently serving that patient;
3. Requiring MedLife to identify all persons or entities to whom it has disclosed Proprietary Patient Information or Confidential Information outside the scope permitted by the Staffing Agreements and BAAs;
4. Requiring MedLife to preserve all documents and communications relating to its solicitation of nurses or VC Patients, including but not limited to text messages, emails, phone records, and internal communications;

B. Award VitalCare preliminary and permanent injunctive relief for MedLife's violation of the DTSA;

C. Award VitalCare preliminary and permanent injnctive relief for MedLife's violation of the Illinois Trade Secrets Act;

D. Award VitalCare preliminary and permanent injunctive relief for MedLife's violation of the Missouri Uniform Trade Secrets Act;

E. Award all available damages against MedLife and in favor of VitalCare in an amount to be determined at trial, plus all costs, expenses and fees permitted by statute.

F. Such other and further relief as the Court deems necessary and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted this 18th day of August, 2026.

*/s/ Matthew J. Ford*
Matthew J. Ford
BAILEY & GLASSER, LLP
3000 Riverchase Galleria, Suite 905
Birmingham, AL 35244
T: (205) 988-9253
F: (205) 733-4896
E: mford@baileyglasser.com

Brian A. Glasser (*pro hac vice* forthcoming)
Elliott McGraw (*pro hac vice* forthcoming)
BAILEY & GLASSER, LLP
1055 Thomas Jefferson St., Suite 540
Washington, DC 20007
T: (202) 463-2101
F: (202) 463-2103
E: bglasser@baileyglasser.com
emcgraw@baileyglasser.com

*Counsel for Plaintiff*

**DEFENDANTS TO BE SERVED VIA PROCESS SERVER AS FOLLOWS:**

MEDLIFE INFUSION NURSING, LLC
c/o CHRISTOPHER S. PALMEDO (Registered Agent)
2020 Old Coal City Road
Pell City, AL 35125

WESLEY DUCKWORTH
883 BROOKLINE ROAD
GARDENDALE, AL 35071

CHRISTOPHER PALMEDO
2020 Old Coal City Road
Pell City, AL 35125